**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

_____
:
STATE OF NEW JERSEY, DEPARTMENT    :
OF ENVIRONMENTAL PROTECTION, et al.,  :
    :
    Plaintiffs,    :
    :
    v.    :    Civil Action No. 09-5591 (JAP)
    :    (consolidated with
UNITED STATES ARMY CORPS OF    :    Civil Action No. 09-5889)
ENGINEERS, et al.,    :
    :
    Defendants,    :
    :    **OPINION**
and    :
    :
PHILADELPHIA REGIONAL PORT    :
AUTHORITY,    :
    :
    Defendant-Intervenor.    :
_____:

PISANO, District Judge:

    Presently before the Court are motions for summary judgment by plaintiffs the Delaware

Riverkeeper, Delaware Riverkeeper Network, Delaware Nature Society, National Wildlife

Federation, New Jersey Environmental Federation, and Clean Water Action (collectively,

"DRN") (Docket Entry no. 83) and plaintiff the State of New Jersey, Department of

Environmental Protection ("NJDEP," and collectively, "Plaintiffs") (Docket Entry no. 81).

Defendants the U.S. Army Corps of Engineers, *et. al.* (the "Corps") and the Philadelphia

Regional Port Authority ("PRPA," and collectively, "Defendants") have opposed the motions

and responded with their own cross-motions for summary judgment (respectively, Docket Entry

nos. 87 and 88).  For the reasons that follow, Plaintiffs' motions for summary judgment are denied and Defendants' cross-motions for summary judgment are granted.

## I.        Procedural History

On November 2, 2009, NJDEP filed this action pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, to challenge determinations made by the Corps under the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, the Coastal Zone Management Act ("CZMA"), 16 U.S.C. § 1451 *et seq.*, the Clean Water Act ("CWA"), 33 U.S.C. § 1251 *et seq.*, and the Clean Air Act ("CAA"), 42 U.S.C. § 7401 *et seq.*, in connection with the Delaware River Mainstem and Channel Deepening Project to deepen the Delaware River (the "Project"). The only non-federal sponsor of the Project, PRPA, subsequently intervened as a defendant.  On March 12, 2010, the Court consolidated this action with a federal suit presenting substantially identical issues of law and fact that was filed by DRN.[1]  NJDEP and DRN filed their motions for summary judgment on August 12, 2010.  On November 4, 2010, the Court denied a motion to stay filed by DRN.

Three days before NJDEP filed its complaint in the instant case, litigation regarding the Project began in Delaware when the Delaware Department of Natural Resources and Environmental Control filed suit against the Corps in the District of Delaware to halt the deepening (the "Delaware Action").  The State of New Jersey and PRPA intervened in the Delaware Action, where the court originally allowed the first phase of the deepening project, located entirely in the State of Delaware, to proceed but enjoined the rest of the deepening

---

[1]      DRN also brought claims under the Fish and Wildlife Coordination Act, ("FWCA") 16 U.S.C. § 661 *et seq.*, the Water Resources Development Act of 2007 ("WRDA"), and the Magnuson-Stevens Fishery Conservation and Management Act ("MSA"), 16 U.S.C. § 1801 *et seq.*

2

project.  Recently, the Honorable Judge Sue Robinson of the District of Delaware lifted the injunction and entered judgment in favor of the Corps and PRPA.

## II.     Background

The Delaware River provides a commercial waterway from Trenton, New Jersey to the Atlantic Ocean.  *See* Administrative Record ("AR") 000011.[2]  There are major ports at Philadelphia, Pennsylvania, at Camden, New Jersey, and at Wilmington, Delaware.  *Id.* Combined, the ports along the Delaware River support an estimated 75,000 jobs, generate billions of dollars in terms of economic revenue and payroll wages, and contribute more than $150 million in state and local taxes.  *Del. Dep't of Nat. Res. & Envtl. Control v. U.S. Army Corps of Eng'rs*, 681 F. Supp. 2d 546, 549 (D. Del. 2010) (hereinafter "*Del. Inj. Opinion*"). Congress has long recognized the economic importance of the Delaware River's commercial capacity, authorizing improvements to the river as early as 1836.  AR 000011.  To sustain the vital economic contributions of the ports, Congress has authorized the Corps to maintain the Delaware's main navigation channel at a sufficient depth to allow vessel navigation.  Since World War II, the Corps has maintained the channel at a depth of 40 feet.[3]  *Del. Inj. Opinion*, 681 F. Supp 2d at 549.

As commercial vessels became larger and required deeper drafts, Congress directed the Corps in 1983 to determine whether it was in the federal interest to deepen the Delaware River channel.  After years of study, the Corps issued a *Final Interim Feasibility Report and Environmental Impact Statement* in 1992 (the "EIS") in which it recommended that a depth of 45

---

[2]      The Corps submitted an administrative record by order of the Court on April 26, 2010. Citations to documents in the administrative record are made by referencing the document's Bates number: "AR _____."

[3]      Since the 1970s, the Corps has maintained the depth of the channel by regular dredging. *Del. Inj. Opinion*, 681 F. Supp 2d at 549, n.3.

feet was necessary to accommodate the current trend of vessel drafts.  *See* AR 002459 (syllabus).

Accepting the recommendations included in the EIS, Congress authorized the Corps to deepen a

102-mile stretch of the Delaware River, from the Philadelphia and Camden ports to the Atlantic

Ocean, to 45 feet,  *see* Water Res. Dev. Act of 1992, Pub. L. No. 102-580, § 101(6), 106 Stat.

4797, 4802, and has appropriated significant funds towards the Project's estimated total cost of

$300 million.

　　　　After further coordination with federal and state environmental resource agencies, the

Corps addressed certain residual concerns raised by the EIS and subsequent environmental

investigations in a 1997 *Supplemental Environmental Impact Statement* (the "SEIS").  AR

017724 (abstract).  A notice and comment period on the SEIS followed, and in 1998 the Corps

issued a new Record of Decision ("ROD").  *See* U.S. Army Corps of Engineers, Philadelphia

District, Delaware River Main Channel Deepening Project, *available at*

http://www.nap.usace.army.mil/cenap-pl/drmcdp/overview.html (last visited January 3, 2011).

In 2008, PRPA partnered with the Corps as the new non-federal sponsor for the Project.  *See* AR

044610-52 (Project Partnership Agreement).  Acknowledging the time that had elapsed since the

SEIS, the Corps then offered a month-long public comment period for a new environmental

assessment on project changes and new environmental information, *see* AR 024043-45 (Dec. 17,

2008 public notice).  In April 2009, the Corps issued its final Environmental Assessment ("EA"),

which updated several environmental studies.  *See* AR 024931.  The EA concluded that any

changes to the Project were not substantial enough and any new information was not significant

enough to warrant another supplemental environmental impact statement.  AR 024931.0155.

　　　　In 1996, the Corps provided a consistency determination to NJDEP pursuant to the

CZMA.  AR 025011-13; *see* 16 U.S.C. § 1456(c)(1)(A).  After NJDEP and the Corps signed a

4

memorandum of understanding, NJDEP certified that the Project was consistent with the approved New Jersey Coastal Zone Management program in 1997. *See* AR 025027-34. In 2002, NJDEP advised the Corps that it was revoking its CMZA concurrence due to alleged substantial changes that had occurred in the previous five years. AR 025047-51. In response, the Corps agreed to provide supplemental information to the 1997 concurrence. AR 025052-53. After receiving letters from the NJDEP in 2008 seeking supplemental coordination under CZMA, *see* AR 023974 and AR 025055, and in 2009 seeking a supplemental CZMA consistency determination, *see* AR 025128-30, the Corps issued a memorandum for record, AR 025147-52, in which it concluded that there had been no substantial changes to the Project or significant new information that would warrant issuing a supplemental consistency determination to NJDEP.

The Corps first addressed whether the Project would conform to the applicable state implementation plans ("SIPs"), as required by the CAA, 42 U.S.C. § 7506(c)(1), in its *Delaware River Main Channel Deepening Project, General Conformity Analysis and Mitigation Report* in 2004. AR 025211-359. In August 2009, the Corps prepared a *Draft Conditional Statement of Conformity* for public comment. AR 025506-09. After reviewing objections by NJDEP, DNR, and others, the Corps prepared a new proposal in a *Draft Statement of Conformity*, AR 025658-6, and a new *General Conformity Analysis and Mitigation Report*, AR 025525-657, in November 2009. A final determination was issued on December 30, 2009 in a *Final Statement of Conformity* (the "Conformity Determination") wherein the Corps stated that the Project would conform to the applicable SIPs pending the purchase of emission reduction credits to offset nitrogen oxide emissions generated during the dredging. AR 025888-92.

### III.    Standard of Review

#### A.    Summary Judgment

To prevail on a motion for summary judgment, the moving party must establish "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ.  P. 56(c).  The district court must determine whether disputed issues of material fact exist, but the court cannot resolve factual disputes in a motion for summary judgment.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249-50, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

In determining whether a genuine issue of material fact exists, the court must view the facts in the light most favorable to the non-moving party and extend all reasonable inferences to that party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986); *Stephens v. Kerrigan,* 122 F.3d 171, 176-77 (3d Cir. 1997).  The moving party always bears the initial burden of demonstrating the absence of a genuine issue of material fact, regardless of which party ultimately would have the burden of persuasion at trial.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).  Once the moving party has met its opening burden, the non-moving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial.  *Id.* at 324.  Thus, the non-moving party may not rest upon the mere allegations or denials of its pleadings.  *Id.*  "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Id.* at 322.

Once the moving-party has demonstrated to the court the absence of a material fact at issue, the Supreme Court has stated that the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts...." *Matsushita,* 475 U.S. at 586-87 (citations omitted).  In other words, "[i]f the evidence [submitted by the non-moving party] is merely colorable ... or is not significantly probative ... summary judgment may be granted." *Anderson,* 477 U.S. at 249-50 (citations omitted).

The Supreme Court has specifically recognized that "[o]ne of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupportable claims or defenses, and [ ] that [the rule] should be interpreted in a way that allows it to accomplish this purpose." *Celotex,* 477 U.S. at 323-24.  Thus, "[w]hen the record is such that it would not support a rational finding that an essential element of the non-moving party's claim or defense exists, summary judgment must be entered for the moving party." *Turner v. Schering-Plough Corp.,* 901 F.2d 335, 341 (3d Cir. 1990).

**B.     Administrative Procedures Act**

Judicial review under the Administrative Procedures Act ("APA"), the statutory scheme that governs this Court's review of the agency action at issue in this case, is limited.  APA section 706(2)(A) states in pertinent part:

The reviewing court shall—

> (2) hold unlawful and set aside agency action, findings, and conclusions found to be--
>
> > (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

5 U.S.C. § 706(2)(A).

The "arbitrary and capricious" standard set out in section 706(2)(A) is narrow and a reviewing court is not permitted to substitute its own judgment for that of the agency.  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  If the agency has examined the data relevant to its decision and can "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made'" the agency action will be upheld.  *Id.* (quoting *Burlington Truck Lines v. United States,* 371 U.S. 156, 168 (1962)).

**IV.     Discussion**

   **A.     National Environmental Policy Act**

   Congress passed the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.*, to focus governmental and public attention on the potential environmental effects of any proposed "major federal action."  *See* 42 U.S.C. § 4332; *Marsh v. Or. Nat. Res. Def. Council*, 490 U.S. 360, 371, 109 S. Ct. 1851 (1989).  Council on Environmental Quality ("CEQ") regulations provide guidance to agencies in applying the statute.  *See* 40 C.F.R. §§ 1500-08.  In addition, the Corps has promulgated agency-specific NEPA regulations.  *See* 33 C.F.R. Part 230.

   NEPA is a purely procedural statute and does not mandate any particular result for the agency action in question.  *NJDEP v. U.S. Nuclear Regulatory Comm'n*, 561 F.3d 132, 133 (3d Cir. 2009) (citing *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350–51 (1989)).  "NEPA 'merely prohibits uninformed—rather than unwise—'" decisionmaking.  *Id.* at 134 (quoting *Methow Valley*, 490 U.S. at 351).  A court may not require agencies "to elevate environmental concerns over other, admittedly legitimate, considerations."  *Stryker's Bay Neighborhood Council v. Karlen*, 444 U.S. 223, 227–28 n.2 (1980).  The statute is aimed at ensuring that the agency has considered the potential significant environmental impacts of its

8

proposed action, and informed the public that it has indeed made that consideration.  *U.S. Nuclear Regulatory Comm'n*, 561 F.3d at 134 (citing *Baltimore Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 97 (1983)).

To that end, NEPA requires federal agencies to prepare an environmental impact statement, or EIS, for any major federal action "significantly affecting the quality of the human environment."  42 U.S.C. § 4332(C).  If an action or actions do not on their face require an EIS, the agency may conduct an environmental assessment, or EA, to determine whether an EIS is necessary.  40 C.F.R. §§ 1501.3-1501.4.  If the agency determines that an EIS is not required, it issues a Finding of No Significant Impact ("FONSI") and is not required to prepare an EIS.  *See Allegheny Def. Project, Inc. v. U.S. Forest Serv.*, 423 F.3d 215, 223 n.14 (3d Cir. 2005) (citing 40 C.F.R. §§ 1501.4, 1508.9).

Agencies must supplement their NEPA documents with further analyses where "the agency makes substantial changes in the proposed action that are relevant to environmental concerns" or where "there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts."  40 C.F.R. § 1502.9(c)(1); *see* 33 C.F.R. § 230.13(b) (Corps regulations).  A supplemental EIS, or SEIS, must be prepared only "[i]f the new information is sufficient to show that the remaining action will 'affec[t] the quality of the human environment' in a significant manner or to a significant extent already not considered."  *Marsh*, 490 U.S. at 374.

Plaintiffs argue that (1) the Corps' EA and (2) its decision not to prepare a second SEIS are arbitrary, capricious, and in violation of the requirements of NEPA.  With respect to the EA, Plaintiffs claim that there were flaws in the process the Corps used to issue its EA.  Specifically, they claim that there was no FONSI before the Corps' decision not to issue a second SEIS and

they claim that there was a lack of public notice and comment in violation of NEPA.  (NJDEP Br. 29; DRN Br. 94-105).

Plaintiffs point out certain regulations and precedent that require a FONSI determination if an agency concludes in its EA that an EIS is not required.  *See, e.g.*, 40 C.F.R. § 1501.4(e) (explaining that an agency shall "[p]repare a [FONSI], if the agency determines on the basis of the [EA] not to prepare a[n EIS]").  In its 2009 EA, the Corps determined that a second SEIS was not required; therefore, the Plaintiffs argue, the Corps violated NEPA by failing to prepare a FONSI.  Plaintiffs have produced no support, however, that a FONSI is required if an EA determines that no supplementation to an existing EIS or SEIS is required.  *See In re Op. of the Mo. River Sys. Litig.*, 516 F.3d 688, 695 (8th Cir. 2008) (upholding the Corps' EA concluding that an SEIS was not required even when the Corps produced no FONSI).  Federal regulations do not provide a specific process to determine whether to prepare an SEIS or an additional SEIS.  Indeed, the relevant regulations instead provide that "[a]gencies may prepare an [EA] on any action at any time in order to assist agency planning and decisionmaking."  40 C.F.R. § 1501.3(b).  In this case, the Corps had already prepared an EIS in 1992 and an SEIS in 1997.  The Corps issued its 2009 EA, not to determine whether to prepare an EIS, but rather to assess project changes and new information and to determine whether the existing EIS and SEIS required supplementation.  This use of an EA comports with NEPA.

Plaintiffs also emphasize that NEPA mandates "the broad dissemination of information [that] permits the public and other government agencies to react to the effects of a proposed action at a meaningful time."  *Marsh*, 490 U.S. at 371.  Throughout the history of the Project, the Corps has involved the public on numerous occasions.  *See, e.g.*, Notice of Intent To Prepare a Draft Environmental Impact Statement Amendment, 56 Fed. Reg. 26999 (June 12, 1991); Public

Notice of Record of Decision, AR 019330 (January 21, 1999).  The Record contains correspondence that provides evidence of extensive public comment.  *See, e.g.,* Letter from the Corps to NJDEP regarding CZMA consistency, AR 024993-94 (July 30, 1990); Corps of Engineers Responses to Letters Received on Final Supplemental Environmental Impact Statement Dated July 1997, AR 018756-965.  Finally, the Corps reengaged the public before finally beginning the channel deepening with its December 17, 2008 public notice.  AR 024043-45.  The notice invited comment on project changes and sought new information to determine if further environmental review was required.  *Id.*

Plaintiffs claim that, despite this history of public involvement with the Project, the Corps failed to adhere to NEPA by not providing public notice of the 2009 EA, by responding to comments to its public notice after the EA was issued, and by not conducting a 30-day public review.  The requirements that Plaintiffs cite as being violated by the Corps, however, apply only to cases where an agency is evaluating whether to prepare an EIS, rather than whether to supplement an existing EIS or SEIS.  *See, e.g., Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Eng'rs*, 524 F.3d 938, 954 (9th Cir. 2008) (describing EA requirements when prepared "to determine whether to prepare an EIS or to issue a FONSI"); CEQ, "Forty Most Asked Questions Concerning CEQ's NEPA Regulations," 46 Fed. Reg. 18,026, Q. 37b (mandating particular public review for a "FONSI . . . before the agency's final determination whether to prepare an EIS").  As the Court has noted, there are no regulations in place that prescribe a specific process to determine whether to supplement an existing EIS.  In addition, there is an extensive history of public involvement in the Project.  Therefore, the Court finds that the Corps' dissemination of information comported with NEPA requirements.

Plaintiffs take issue with the EA's finding that changes to the Project were not substantial enough and any new information was not significant enough for supplementation of the EIS or SEIS.  The Supreme Court affirmed in *Marsh v. Oregon Natural Resources Council* that the key question an agency must decide in determining whether to supplement an EIS is whether "the new information is sufficient to show that the remaining action will affect the quality of the human environment in a significant manner or to a significant extent not already considered." 490 U.S. at 374.  A court's review of an agency's decision not to supplement an EIS is controlled by the "arbitrary and capricious" standard of the APA.  *Id.* at 375.  The Court further explained:

> [I]n making the factual inquiry concerning whether an agency decision was "arbitrary or capricious," the reviewing court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.  This inquiry must be searching and careful, but the ultimate standard of review is a narrow one. . . .  On the other hand, in the context of reviewing a decision not to supplement an EIS, courts should not automatically defer to the agency's express reliance on an interest in finality without carefully reviewing the record and satisfying themselves that the agency has made a reasoned decision based on its evaluation of the significance—or lack of significance—of the new information.

*Id.* at 378 (internal quotation marks omitted).

Potentially significant information or circumstances that have arisen since the 1997 supplementation of the EIS include (1) the 2004 Athos oil spill and (2) the distribution of Shortnose sturgeon within the Project area.  In November 2004, the M/T *Athos I* struck a submerged anchor, leaking more than 263,000 gallons of oil into the Delaware River.  In January 2009, the National Oceanic and Atmospheric Administration ("NOAA"), in conjunction with the U.S. Fish and Wildlife Service, Delaware, New Jersey, and Pennsylvania, prepared a *Draft Damage Assessment and Restoration Plan and Environmental Assessment* (the "NOAA Report"), AR 024355-548, that analyzed the potential effects of the spill on the quality of the human environment as required by NEPA.  The NOAA Report concluded from sediment

samples that pre-spill conditions were reached 14 months after the spill.  AR 024403.  In addition

to the NOAA Report, the Corps relied on its own 2005 sampling that concluded that sediment

was not significantly affected by the spill.  AR 024931.0106; *see* AR 023125 (conclusions for

2005 sediment sampling report).  NJDEP contests these conclusions, claiming that the sampling

did not adequately address the contamination of channel banks or side slopes, but just the main

channel.  (NJDEP Br. 34).  The conclusions from the NOAA Report, however, were reached

after analysis of 162 sediment samples from subtidal and intertidal sediment in a random

stratified sampling.  AR 024403.  The Corps further analyzed NOAA samples from the main

channel, AR 024931.0106, and its 2005 sampling report provided further samples from the main

channel.  The analysis of these reports is exactly the kind that "requires a high level of technical

expertise . . . [that mandates] defer[ence] to the informed discretion of the responsible federal

agenc[y]."  *Marsh*, 490 U.S. at 377.  The Corps determined that the sampling was adequate, and

after a careful review of the record, the Court is convinced that the Corps gave the issue the

"hard look" required by NEPA, conducted a reasoned evaluation of the relevant information and

reached a decision not to supplement the EIS or SEIS that was not "arbitrary and capricious."

The Corps also concluded that potential increases in the Shortnose sturgeon population

was not a significant change to the quality of the affected environment.  AR 024931.0008.  In its

SEIS, the Corps took the Shortnose sturgeon into consideration and established dredging

windows and prohibitions.  AR 018109-10.  The Corps determined that increases in the

population would not be significantly affected due to the windows and prohibitions already in

place.  AR 018104.  In addition, the Corps relied on a 2000 study finding no significant impact if

minimization measures were taken.  *See* AR 019914-27.  Finally, the National Marine Fisheries

Service is preparing a Biological Opinion on the Shortnose sturgeon concerning project impacts,

and the Corps plans on complying with all project-related conditions recommended to minimize potential adverse effects on the species.  AR 024931.0008.  These considerations and determinations fulfill the reasoned evaluation required so that the Corps' decision was not "arbitrary and capricious" with respect to the Shortnose sturgeon information.

DRN likewise contests the Corps' decision not to supplement its EIS or SEIS with respect to new information regarding the Atlantic sturgeon and oysters.  While the Corps admits that new information exists with respect to each, it claims that the changes are not significant and that any impact as a result of the changes is not significant.  With respect to the Atlantic sturgeon, the Corps' EA devotes significant space to the efforts made to accommodate the species during the dredging and to the lack of an impact the completed channel will have.  AR 024931.0139-41.  The Corps carefully reviewed its reports and made a reasoned determination that the changes and impacts were not significant.  With respect to the oysters, the Corps performed monitoring tests and constructed different models to take a hard look at the impacts the dredging would have on oysters.  AR 024931.0123-125.  The Corps then determined that the Project will have "minimal" or no adverse impacts on oyster beds or oyster resources.  *Id.*  DRN also raised issues regarding new information on several other plant and animal species, as well as groundwater and environmental windows, but failed to provide detail on how this new information was significant in any way.  Furthermore, the Corps addressed several of these changes in its EA.  *See* AR 024931.0128–29 (winter flounder); AR 024931.0135 (sea turtles); AR 024391.0141–42 (bald eagle, peregrine falcon, and red knot); AR 024391.0111–23 (horseshoe crabs); AR 024391.0108–11 (blue crab); AR 024391-0142 (plants); AR 024391.0083-85 (groundwater); AR 024931.0036 (current environmental windows).  A review of the record compels the Court to hold that the Corps made a reasoned evaluation of new

information so that its decision not to supplement its EIS or SEIS was not "arbitrary or capricious."

The Corps has also identified three changes to the Project that it determined were not significant: (1) a reduction in the quantity of dredged material and disposal sites; (2) the direct placement of dredged sand onto Broadkill Beach; and (3) deferment of the planned restoration for Egg Island Point.  AR 024391.0007.  The reduction of the quantity of dredged material and the accompanying reduction in disposal sites is not a change that must be included in a supplement to an EIS or SEIS simply because the reduction falls within the scope of the original NEPA analysis in the EIS and SEIS.  *See Sierra Club v. Van Antwerp*, 526 F.3d 1353, 1360 (11th Cir. 2008) ("When the change to the proposed action is a 'minimizing measure,' . . . the agency is not automatically required to redo the entire environmental analysis [] because a minimizing measure's effects on the environment will usually fall within the scope of the original NEPA analysis.") (internal citations and quotation marks omitted).  The direct placement of dredged sand onto Broadkill Beach is a change in the sense that the Corps now plans on placing the sand there directly instead of first stockpiling it elsewhere, as it had originally planned. Indeed, a separate environmental review of the sand placement considered this alternative.  AR 017340.  Furthermore, the change was suggested by the U.S. Environmental Protection Agency ("EPA") as a better alternative for the environment.  AR 018499.  Finally, deferring the restoration of Egg Island Point, due to the reduction in dredged material, does not warrant supplementation because it will proceed as contemplated in the original NEPA analysis, just at a later date.  Such a change is not significant enough to warrant supplementation.  It is evident, therefore, that the Corps' decision not to supplement its EIS or SEIS with regard to changes in the Project was not "arbitrary or capricious."

15

### B.   Coastal Zone Management Act

Congress enacted the Coastal Zone Management Act of 1972, 16 U.S.C. § 1451 *et seq.*, to preserve, protect, develop, and where possible, to restore or enhance, the resources of the Nation's coastal zone, and to encourage local, state, and federal coordination on actions in the coastal zone.  16 U.S.C. § 1452.  To achieve these ends, the CZMA requires federal agency activities within or that affect a state's coastal zone to be consistent to the maximum extent practicable with that state's coastal zone management program.  16 U.S.C. § 1456(c)(1)(A); 15 C.F.R. §§ 930.34(a)(1), 930.39(c).  An agency ensures consistency of its proposed actions with state management plans by submitting a consistency determination to the state, which then concurs or objects to the determination.  16 U.S.C. § 1456(c)(1)(C); 15 C.F.R. § 930.41(a).  If the state objects, the project may still proceed if the federal agency "conclude[s] that its proposed action is fully consistent with the enforceable policies of the management program."  15 C.F.R. § 930.43(d)(2).  The federal agency must supplement a consistency determination "if the proposed activity will affect any coastal use or resource substantially different than originally described."  15 CFR § 930.46(a).

Plaintiffs claim that the Corps' decision not to supplement its consistency determination was arbitrary, capricious, and in violation of the CZMA.  They claim that supplementation is required because there have been "substantial changes in the proposed activity" and "significant new circumstances or information relevant to the proposed activity."  (NJDEP Br. 37); *see* 15 C.F.R. § 930.46(a).  On November 9, 2009, the Corps issued a memorandum for record in which it concluded, based on its EA, that no supplemental coordination was required because there were not any substantial changes to the Project nor any significant new circumstances or information.  AR025147-52.  Plaintiffs claim that because the EA was flawed, the decision not to

supplement its CZMA consistency determination is likewise in violation of the CZMA.  As the Court discussed above, however, the Corps' determination in its EA that there were no substantial changes or significant new information was decided in accordance with the law. Therefore, its determination not to supplement its consistency plan, based on the EA, was similarly decided in accordance with the law, and was not arbitrary or capricious.

Plaintiffs claim that NJDEP's concurrence with the Corps' consistency determination was conditioned on the Corps' performing additional testing.  NJDEP claims that additional testing was a condition to beginning the Project.  The Corps correctly points out, however, that the memorandum of understanding between NJDEP and the Corps, on which NJDEP's concurrence was supposedly conditioned, provides for sampling protocols "to be implemented throughout the life of the [Project]," and does not establish a condition precedent of starting the Project.  AR 025030.  Thus it appears there are no conditions that the Corps did not satisfy that would render the concurrence invalid.

Plaintiffs finally claim that NJDEP's concurrence was revoked by NJDEP in 2002. The Corps notes, however, that regulations prohibit a state from "revoking" its  concurrence with a consistency determination.  *See* 15 C.F.R. § 930.41(d) ("A State agency cannot unilaterally place an expiration date on its concurrence.").  Indeed, the CZMA "only authorizes one bite of the consistency apple for any particular Federal agency activity."  CZMA Federal Consistency Regulations, 65 Fed. Reg. 77,124, 77,141 (Dec. 8, 2000).  Judge Robinson in Delaware similarly determined that Delaware's post-concurrence objections held no merit.  *Del. Inj. Opinion*, 681 F. Supp. 2d at 560 ("Once [Delaware] concurred, it waived any objections to the Deepening Project with respect to the [management plan].  For the same reasons, NJDEP may not revoke its

concurrence with the Corps' consistency determination."). Accordingly, NJDEP's revocation is similarly ineffective.

### C.   Clean Water Act

The Clean Water Act, 33 U.S.C. § 1251 *et seq.*, establishes a comprehensive program designed to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). Unless authorized by section 404, the CWA generally prohibits the discharge of any pollutant, including dredged or fill material, into navigable waters. 33 U.S.C. § 1311(a). Section 404 typically authorizes the discharge of dredged and fill material in the form of a Corps-issued permit. 33 U.S.C. § 1344. No authorization is necessary under section 404, however, when the discharge is part of the construction of a federal project specifically authorized by Congress so long as an environmental impact statement under NEPA has been submitted to Congress before the actual discharge of dredged or fill material and prior to the project's authorization or appropriation of funds by Congress. 33 U.S.C. § 1344(r).[4] This permit exception, however, does not apply to effluent standards or prohibitions under 33 U.S.C. § 1317. *Id.*

---

[4]      The full text of the permit exception under section 404(r) reads:

> The discharge of dredged or fill material as part of the construction of a Federal project specifically authorized by Congress, whether prior to or on or after December 27, 1977, is not prohibited by or otherwise subject to regulation under this section, or a State program approved under this section, or section 1311 (a) or 1342 of this title (except for effluent standards or prohibitions under section 1317 of this title), if information on the effects of such discharge, including consideration of the guidelines developed under subsection (b)(1) of this section, is included in an environmental impact statement for such project pursuant to the National Environmental Policy Act of 1969 and such environmental impact statement has been submitted to Congress before the actual discharge of dredged or fill material in connection with the construction of such project and prior to either authorization of such project or an appropriation of funds for such construction.

The Corps has satisfied the requirements listed in section 404(r) such that it need not have obtained a section 404 permit. The Project is a construction project that has been specifically authorized by Congress. *See* Water Res. Dev. Act of 1992, Pub. L. No. 102-580, § 101(6), 106 Stat. 4797, 4802. The EIS was submitted to Congress in February 1992, *see* AR 002457 (the EIS), before any discharge. The submission was also before the Project's authorization, and before funds were appropriated by Congress, which has occurred nearly every year since the authorization.

An applicant for a section 404 permit must also obtain, pursuant to section 401 of the CWA, a water quality certification from the applicable state certifying that the proposed discharge will be consistent with state water quality standards. 33 U.S.C. § 1341(a)(1). Because the Corps qualified for the exception under 404(r), however, it was not an applicant for a section 404 permit. Therefore, the Corps did not need to obtain a section 401 certification from New Jersey. NJDEP contends that because the Corps has been obtaining certification from New Jersey for its maintenance dredging since the early 1980s, the Corps' failure to apply for one in this instance is arbitrary and inconsistent. NJDEP fails, however, to note that specific language of the section 404(r) exception makes clear that it applies to "construction" projects authorized by Congress, rather than maintenance projects. 33 U.S.C. § 1344(r).

The section 404(r) permit exception does not apply to effluent standards or prohibitions under 33 U.S.C. § 1317. Nevertheless, the toxic and pretreatment effluent standards established in section 307 of the CWA, 33 U.S.C. § 1317, do not apply to the Corps in this instance. Section 307(a)(2) authorizes the EPA to promulgate regulations effluent standards and prohibitions for any category or class of point source. 33 U.S.C. § 1317(a)(2). Pursuant to this authorization, the EPA has established standards in for certain toxic pollutants codified at 40 C.F.R. Part 129.

These standards are only applicable to the sources and pollutants listed in the regulations. 40 C.F.R. § 129.1(a)-(b). The sources include only manufacturers, formulators, or applicators of certain pollutants. 40 C.F.R. § 129.100-105. Because the Corps qualifies as none of those sources, the toxic pollutants standards do not apply to the Corps. Likewise, the pretreatment effluent standards apply only to discharges to publicly owned treatment works, 33 U.S.C. § 1317(b), which the Project will not generate. Thus, the pretreatment effluent standards do not apply to the Corps for the Project.

Furthermore, pursuant to CWA section 505, a citizen may only bring a civil action to enforce an effluent standard or limitation after providing sixty days notice of the alleged violation. 33 U.S.C. § 1365(b). This provision applies to claims under 33 U.S.C. §§ 1317 (toxic and pretreatment effluent standards) and 1341 (state certification). To the extent Plaintiffs challenge any alleged violations of effluent standards or certifications, they have failed to meet this notice requirement and those claims must be dismissed.

Finally, Plaintiffs claim that the Corps violated its own regulations that provide that "[t]he CWA requires the Corps to seek state water quality certification for discharges of dredged or fill material into waters of the U.S." 33 C.F.R § 336.1(a)(1). NJDEP asserts that this regulation applies, in spite of the 404(r) exception, because "the Corps authorizes its own discharges of dredged or fill material by applying all applicable substantive legal requirements." 33 C.F.R. § 336.1(a) (emphasis added by NJDEP in its brief at 39). By concentrating on "all" to the detriment of "applicable," NJDEP misreads the regulation. (*See* NJDEP Br. 39 ("Given this obligation to comply with all substantive legal requirements . . . .")). Because the Project qualifies for the permit exception under section 404(r), the regulation that mandates certification

is an inapplicable requirement.  Accordingly, all claims under the CWA alleged by Plaintiffs fail to demonstrate that the Corps acted arbitrarily, capriciously, or in violation of the law.

### D.    Clean Air Act

The Clean Air Act, 42 U.S.C. § 7401 *et seq.*, establishes a joint state and federal program to control the Nation's air pollution.  To protect the public health and welfare, Section 109 of the CAA requires the EPA to establish national ambient air quality standards ("NAAQS")  for certain pollutants.  42 U.S.C. § 7409(b).  The EPA has established NAAQS for six pollutants, including ozone.  *See* 40 C.F.R. Part 50.  The CAA directs implementation of the NAAQS through State Implementation Plans, or SIPs, prepared by each state, subject to EPA review and approval, for each area within the state.  42 U.S.C. § 7410.

The conformity process of the CAA intends to ensure that federal agency actions will not interfere with the implementation of the SIPs.  Section 176(c)(1) provides that no federal agency shall "engage in, support in any way or provide financial assistance for, license or permit, or approve, any activity which does not conform to an implementation plan after it has been approved or promulgated under section 7410 of this title."  42 U.S.C. § 7506(c)(1).  A conformity determination is required for federal activities in areas that have not attained the NAAQS ("nonattainment areas") for each pollutant for which the areas is designated a nonattainment area.  *Id.*  EPA regulations also require a federal agency to prepare a conformity determination for actions that produce emissions in excess of the specific *de minimis* levels set in the regulations.  40 C.F.R. § 93.153(b).  For precursors of ozone such as nitrogen oxide ("NOx"), conformity may be achieved when the federal agency fully offsets the total emissions from the action.  40 C.F.R. § 93.158(a)(2).  EPA regulations specify no particular measures to demonstrate conformity.  *See* 40 C.F.R. § 93.160.

The Project will occur in the Philadelphia-Wilmington-Atlantic City air quality area, which has been a nonattainment area for ozone. 74 Fed. Reg. 21,578-79 (May 8, 2009). The Corps concluded in its Conformity Determination that NOx (a precursor for ozone) was the only pollutant or precursor for which it must prepare a conformity determination.[5] AR 025890. The Corps decided that the most efficient way to offset the emissions of NOx associated with the Project was to purchase emission reduction credits ("ERCs"). AR 025891.

Plaintiffs challenge the Corps' use of ERCs to offset the Project's NOx emissions. While conceding that "the conformity rules recognize a role for ERCs," (NJDEP Br. 42), they claim that the Corps' decision to use them was arbitrary, capricious, and unreasonable because it failed to take into account the circumstances surrounding New Jersey's nonattainment of the eight-hour ozone NAAQS. The circumstances to which Plaintiffs refer involve the EPA's proposed finding, as part of a proposed disapproval of an attainment demonstration, that New Jersey would "fall short of attaining the ozone standard by a substantial margin" even if the state implemented the emissions reductions provided by its SIP. New Jersey Ozone Attainment Demonstration, 74 Fed. Reg. 21,578, 21,586 (May 8, 2009). Plaintiffs appear to provide this proposed finding as evidence that the Project's use of ERCs instead of other mitigation measures would exacerbate New Jersey's NAAQS exceedances or delay their timely attainment in violation of the CAA. *See* 42 U.S.C. § 7506(c)(1)(B). As Defendants point out, however, proposed findings or proposed disapprovals of attainment demonstrations are not germane to the Corps' determination of conformity to an SIP. The Corps need only determine the Project's conformity to the applicable SIP; the circumstances pertaining to the state's actual attainment status is beyond the

---

[5]      The Corps determined that NOx was also a precursor for particulate matter 2.5, for which the Philadelphia-Wilmington area is a nonattainment area. Neither NJDEP nor DRN, however, challenges the Corps' Conformity Determination as it relates to NOx as a precursor for particulate matter 2.5.

scope of a conformity determination.  With regard to this Project, the Corps complied with all necessary regulations designed to ensure SIP conformity when it decided to offset the Project's NOx emissions with ERCs.  Accordingly, its decision was not arbitrary or capricious.

Plaintiffs also claim that the Corps' Conformity Determination did not identify written commitments from the entities who were to provide the ERC offsets, as required by 40 C.F.R. § 93.160(b).  In the Conformity Determination, however, the Corps notes that the PRPA is required to purchase as many ERCs as needed to effect the offsets as part of its cost-sharing obligations.  AR 025891.  Regardless, Plaintiffs' claim is moot because the PRPA has already purchased the ERCs for the Project through programs operated by the environmental departments of Pennsylvania, Delaware, and New Jersey, and the written commitments were attached as exhibits to the Corps' summary judgment brief.  At this point, there is no longer any meaningful relief that the Court can provide on the issue.  *See Thomas v. Att'y Gen. of U.S.*, 625 F.3d 134, 140 (3d. Cir. 2010) ("[A]n issue is moot if changes in circumstances that prevailed at the beginning of the litigation have forestalled any occasion for meaningful relief." (citations and internal quotation marks omitted)).

### E.    Fish and Wildlife Coordination Act

Under the Fish and Wildlife Coordination Act, 16 U.S.C. § 661 *et seq.*, a federal agency must first consult with the United States Fish and Wildlife Service ("FWS") before undertaking a channel deepening project.  16 U.S.C. § 662(a).  The consulting agency "shall give full consideration to the report and recommendations" of the FWS,  "and the project plan shall

include such justifiable means and measures for wildlife purposes as the reporting agency finds

should be adopted to obtain maximum overall project benefits." 16 U.S.C. § 662(b).[6]

The FWCA has no citizen suit provision and thus there is no private right of action under

the statute. *See Raymond Proffitt Found. v. U.S. Army Corps of Eng'rs*, 175 F. Supp. 2d 755,

770 (E.D. Pa. 2001) (citing *Sierra Club v. U.S. Army Corps of Eng'rs*, 935 F. Supp. 1556, 1579

(S.D. Ala. 1996)).  Several courts, however, have permitted plaintiffs to raise claims under the

FWCA in conjunction with NEPA claims, reasoning that "the [NEPA] incorporates the FWCA

and that an agency in compliance with NEPA has necessarily also complied with the FWCA."

*Id.*; *see, e.g., Texas Comm. on Nat. Res. v. Marsh,* 736 F.2d 262, 268 (5th Cir. 1984); *Environ.*

*Defense Fund, Inc. v. Froehlke,* 473 F.2d 346, 356 (8th Cir.1972); *Sierra Club,* 935 F. Supp. at

1579; *Bergen Cnty. v. Dole,* 620 F. Supp. 1009, 1064 (D.N.J. 1985).  The Court has already

decided above that the Corps complied with NEPA.  Moreover, DRN's claims that the Corps

failed to give full consideration to the reports and recommendations of FWS and the National

Marine Fisheries Service ("NMFS") are undermined by the numerous responses the Corps

provided to each concern the services raised, including the following concerns addressed by

DRN in its brief: (1) the dredging windows for the Atlantic sturgeon, *see* AR 024931.0140

---

[6]      The Corps' governing regulations further address the agency's obligations under the
FWCA:

> In accordance with the Fish and Wildlife Coordination Act (paragraph 320.3(e) of
> this section) district engineers will consult with the Regional Director, U.S. Fish
> and Wildlife Service, the Regional Director, National Marine Fisheries Service,
> and the head of the agency responsible for fish and wildlife for the state in which
> work is to be performed, with a view to the conservation of wildlife resources by
> prevention of their direct and indirect loss and damage due to the activity
> proposed in a permit application. The Army will give full consideration to the
> views of those agencies on fish and wildlife matters in deciding on the issuance,
> denial, or conditioning of individual or general permits.

33 C.F.R. § 320.4(c).

(explaining the Corps' inability to observe a dredging window due to a competing restriction),

AR 024931.0108 (illustrating the competing restriction on dredging to protect blue crab), AR

024931.0140 (providing for on-board monitors during winter months for Atlantic sturgeon per a

recommendation by NMFS); (2) a new submerged aquatic vegetation survey, *see* AR

024931.0142 (explaining a 2008 survey in which a portion of the Project area was concluded not

to have any submerged aquatic vegetation); (3) changes in usage of upland disposal sites, *see* AR

024931.0169 (eliminating disposal sites cited as a concern by FWS); and (4) evaluation of the

suitability of the Buoy 10 aquatic site, *see* AR 024931.0150 (discussing minimization of water

chemistry impacts at the Buoy 10 site), AR 031402-03 (reciting the adoption a recommendation

by FWS to investigate Buoy 10 alternatives).  For these reasons, the Court determines that the

Corps' decisions based on its consideration of the FWS and NMFS reports were not "arbitrary or

capiricious.".

### F.      Water Resources Development Act

The Water Resources Development Act of 2007 requires that a water resources project

contain a plan to mitigate fish and wildlife losses created by such project.  33 U.S.C. § 2283(d).

DRN complains that the Corps cannot prepare an adequate mitigation plan for the Project until it

prepares a second SEIS that fully analyzes the impacts of the Project.  (DRN Br. 126).  PRPA

responds that by asserting WRDA claims, DRN is simply "looking for another bite at the NEPA

apple." (PRPA Br. 38).  DRN explains that a mitigation plan is required to address the

suspension of potentially toxic sediments, the disposal of potentially contaminated sediments, the

potential threats and disruptions to various species of fish and wildlife that inhabit the Project

area, and key resources for these species.  If those are the reasons that DRN seeks a second SEIS

or a mitigation plan, however, then the Court must agree that DRN's concerns are addressed in

the Court's review of the Corps' NEPA compliance.  The Court has reviewed in detail the Corps' analysis of any potentially substantial or significant changes involving the Project since the EIS and 1997 SEIS and concluded that the Corps' decision not to issue a second SEIS was not arbitrary or capricious.

### G.      Magnuson-Stevens Fishery Conservation and Management Act

Congress passed the Magnuson-Stevens Fishery Conservation and Management Act, 16 U.S.C. § 1801 *et seq.*, "to take immediate action to conserve and manage the fishery resources found off the coasts of the United States."  16 U.S.C. § 1801(b)(1).  To achieve these ends, NMFS approves, implements, and enforces fishery management plans ("FMPs") that are developed and prepared by regional fishery management councils.  *See* 16 U.S.C. § 1852(h)(1).  FMPs must identify essential fish habitat ("EFH") for the fishery based on certain guidelines, minimize adverse effects on such habitat caused by fishing, and identify other actions to encourage the conservation and enhancement of such habitat.  16 U.S.C. § 1853(a)(7).  EFH is defined as "those waters and substrate necessary to fish for spawning, breeding, feeding or growth to maturity."  16 U.S.C. § 1802(10).  Once EFH is designated, MSA requires that federal agencies consult with the Secretary of Commerce regarding actions that may adversely affect EFH.  16 U.S.C. § 1855(b)(2).  Where consultation is required, the Secretary must recommend EFH conservation measures, and the agency must respond to the recommendations, but it is not required to follow them.  16 U.S.C. § 1855(b)(4).

DRN claims that the Corps violated the MSA in several respects.  First, DRN alleges that the Corps failed to use the "best available scientific information," as required by 50 C.F.R. § 600.920(d), for the EHF assessment it provided to begin formal consultation with NMFS because the Corps relied on "stale science" and "ignore[d] updated information."  (DRN Br. 109-10).

The Court's prior discussion of the Corps' review of updated information addressed the fact that the Corps did not ignore updated information.  Because DRN has not introduced evidence of contrary or more relevant science, then its argument that the Corps relied on "stale science" is foreclosed.  *See Commonwealth of Mass. ex rel. Div. of Marine Fisheries v. Daley*, 170 F.3d 23, 30 (1st Cir. 1999) ("If no one proposed anything better, then what is available is best.").  Therefore, the Court is satisfied that the Corps used the "best available scientific information."

DRN also claims that the Corps violated the regulations that provide for a notice period before a final decision on an action.  *See* 50 C.F.R. § 600.920(f) and (h).  This argument appears based on a misunderstanding of when the Corps' EFH assessment was issued.  DRN claims that the assessment was issued "concurrently" with the 2009 EA, such that NMFS had no period of notice to provide comments before a final decision.  The Corps, however, provided its EFH assessment to the NMFS on February 9, 2009.  AR 031553.  NMFS responded with comments on April 16, 2009, expressing appreciation for the Corps' efforts "to develop a complete EFH assessment for the project . . . in light of the scope of the project and the number of species and life stages for which EHF has been designated in the project area."  AR 031578.

DRN further claims that the Corps failed to comply with the MSA's consultation requirements.  Though entitled a "draft" EFH assessment, the February 2009 EFH assessment was a comprehensive analysis of potential effects to EFH, and the Corps made clear to NMFS that it intended the assessment to satisfy the Corps' obligations under the MSA to consult with NMFS.  *See* AR 031471 (explaining that the Corps intended that the assessment would satisfy its obligations under 16 U.S.C. § 1855(b)(2)); AR 031553 (stating that the assessment was provided to NMFS to "initiate formal consultation under the [EFH] provision . . . of the [MSA].").  Despite DRN's assertions to the contrary, the Corps responded to NMFS' further concerns in a

letter dated June 19, 2009.  AR 031593.  NMFS has not raised any further concerns.

Accordingly, the Corps complied with all regulations and statutory requirements for consultation

with NMFS under the MSA.

## V.      Conclusion

Having determined that none of the Corps' decisions in this case were arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law under the

Administrative Procedures Act, the Court denies Plaintiffs' motions for summary judgment and

grants Defendants' cross-motions for summary judgment.  An appropriate order shall issue.

/s/ JOEL A. PISANO
United States District Judge

Dated: January 13, 2011